Good morning. I'm Joan Wolf, counsel for the Court of Redwood City, and I would like to address three issues today. Whether the court, this court, can review the district court's order denying the court's motion for summary adjudication, whether the district court abused its discretion by allowing the jury to be instructed on excuse, and finally, whether there were issues of material fact that should have gone to the jury and did not because the court granted summary judgment on the motion on the federal claims. And I'm going to take these in reverse order. Before you do that, there's an issue that I would appreciate your addressing, and that is the statute of limitations. The trial court allowed that issue to go to the jury, but I find it troubling because it would appear that perhaps the statute of limitations was out of time as a matter of law. And I ask that because more than three years before the filing of the complaint, the court lawyer knew that the court was being held responsible for remedial measures and that there were potential claims against those who had generated waste and sent materials and had every opportunity at that time to find out who had, just from their own knowledge, who had been shipping items, including shell. And so I'm concerned about that issue, and I'd appreciate your addressing it. Absolutely. There were a number of factors that went into what we assert was the jury's factual determination, that while there may have been a discovery of damage, there was not a discovery of liability or potential liability until after the three years, until such a point in time as we were timely. Now, how did that come about? One reason was that, as you know from the record, the DTSC went into Gibson with a search warrant, and they removed a bunch of documents. And among the documents they removed was the Gibson hazardous waste profile that showed that the June 1992 shipment had been certified as a DO-01 waste, and then the hazardous waste manifest showing it was a DO-18, and Mr. Doty, the DTSC's investigator's report, determining that this was a violation of the permitting. And all that had been removed from Gibson's facility. And so the evidence at trial was undisputed, that the port didn't find out that they had, in fact, a negligence-specific cause of action against Shell until that documentation came to light. I thought, however, that the law was that if the plaintiff doesn't necessarily know the identity of the defendant but knows that there's a claim and knows the category of the defendant, I thought that the discovery rule still didn't apply. Am I mistaken about the state of the law? Well, I believe that, again, we go back to the facts here, and what we had was a situation where the trial attorney was calling the district attorney on a regular basis but wasn't getting any information. And so without that information, they didn't have the factual basis on which to file the complaint in that manner. Does that answer your question? Yes, I appreciate your comment. Thank you. I just have one procedural question along the lines of the statute of limitations. I think just before the case went to the jury, a Rule 50A motion was made with respect to the statute of limitations. Am I correct that the district court never ruled on that motion? You are correct. However ---- That's because the verdict came at Jennifer Shell on the merits. This issue was presented to the trial court prior on a motion for summary judgment.  And it was denied by the ---- In the context in which Judge Graber was raising her ---- That's right. It was denied then and denied, of course, by the jury, who, in fact, not only found that there was no statute of limitations violation, they found there was not latches. So on the factual basis, we believe there was a clear finding of fact by the jury. On the issue of the Federal causes of action, the Court found that there were no material disputed issues of fact. And the Court, of course, asserts that there were a number of them and important ones. The ---- we start with ---- oh, I'm sorry. Excuse me. Let me go to this other page. The factors to consider when determining whether you have a time-critical removal action include the cost, complexity, and duration and the immediacy of the threat. As for the complexity, the district court found that the removal of the liquid material was complex. The court asserts it was not. It skimmed the top million gallons, treated it on site, treated the oily water and discarded it, and trucked everything off site. Not very complex. Shell also argued that the removal was complex because they say the planning took too long. But in fact, while the court did begin creating a closure plan back in 1995, what they were doing was determining what they had out here. There are nine tanks filled with 10 million gallons of material. And since we know that Gibson was not always forthright in what it had, the first thing the court had to do was determine what was out there. They hired analytical associates to come in and to determine that. And a general planning took place to see what was going on. But it wasn't until the consent order was signed and the DTSC ordered that an interim measures plan for the removal of everything be completed within 30 days that the court zoned in on the removal of all of that material. So the period of time really should have started as of the signing of the consent order. Do you have a case or regulation or statute or anything that supports that? This is a factual issue. When did the time start? You just said it should have started with the consent, with the signing of the consent order. That's right. I just asked you, is there any regulation or case law that would support that? Yes, there is. There is a definition of a removal action that says it begins when the agency, the lead agency, which is a DTSC, indicates there's an imminent threat. I believe that's the language, and I don't have the citation with me. But didn't the state agency notify the court much earlier on? The state agency in 1995 notified the court that it was now responsible for the cleanup. There was no notification, of which I'm aware, that there was an imminent threat in those words prior to the consent order. And this was three years later. Now, the court found that because of that passage of time, there probably wasn't an imminent threat. But the DTSC, which, of course, is the agency charged by the legislature with enforcing California's hazardous waste law, who was on the port property and looking at it, could well have found that now an imminent danger existed. And, indeed, that's what they said in the court in the consent order. And there's really no reason to go behind that to believe it. It very well could have been that at the end of the three years, they now said, yes, indeed, there's an imminent threat. And that's what they put. Now, the other reason the court rejected that argument was because the port suggested the language. Not very unusual. Courts have parties draft language all the time. The thing to be remembered here is that the DTSC is a 300-pound gorilla. The port doesn't have leverage to force them to accept language of any kind. And yet, in the consent decree, the DTSC specifically says there is an imminent threat of release and sets up a number of things that the port is required to do because of that imminent threat to release it. And it certainly presents, if nothing else, an issue of fact as to whether that existed or the DTSC, for some reason, didn't mean what it says. By the way, there's no indication that the DTSC backtracked on that in any way. The district court also described the port's cleanup as a permanent solution, but it wasn't. The closure plan hadn't been finalized. There were the tanks to be cleaned out. There was the soil to be remediated. There were a number of things still left to be done. Yes, the material that had been removed had been removed, but it was a removal action within a remedial action. It wasn't the totality of the cleanup. It's more like you're picking up a group of containers and taking them off property. You may have removed those from the property, but you haven't removed the leakages and the soil problem. So it was not a closure plan and a final permanent cleanup plan. And there is an argument on all of these issues of fact, which the Court wrongly determined as a matter of law. The factual dispute over whether it was a closure plan or removal right there at the end when you said that they removed the liquid from the tank. That's whether it was a permanent solution or not. And it wasn't a permanent solution. Well, the factual record would show that they still had to deal with the ground and the groundwater. That's right. So what's the dispute over that? Whether, in fact, as a matter of law, the removal of the material constituted a permanent solution or not. And perhaps that is purely an issue of law, Your Honor. I, as we speak, I agree. All right. Let me go then to, unless there are more questions on that. Let me go then to the issue of the court instructing the jury that if it found Shell was unable to determine whether Gibson was permitted after reasonable diligence and also found that the shell had been negligent, that negligence could be excused. So there are two factors here. Shell was unable to determine with reasonable diligence. The jury could have found, because we start with the assumption that there's a finding of negligence in order for this jury instruction to come into play. The jury could have found that Shell had delivered hazardous waste to a facility not permitted to receive it on at least two sets of facts. One was the pre-1990 deliveries of oil and water waste for hazardous waste for recycling, when neither Gibson nor Redwood City Services had a permit to receive any hazardous waste. Or the June 1992 shipment, which was manifested as a DO-18 waste, but in fact had been found by Shell's laboratory to be a DO-01 waste, which the facility was not permitted to receive. It's as for the 1992 shipment, the Shell cites as their reasonable diligence, sending Mr. Gemmenhart to the facility to do an audit. Mr. Gemmenhart found the Part A application of Gibson and determined from that, that since Gibson had written down that it wanted to receive DO-01 waste, that that was a permit. Interestingly enough, it was only an application, and in April of 1992, the DTSC specifically notified Gibson that it could not receive DO-01 waste. Mr. Gemmenhart never saw that document. Mr. Gemmenhart didn't inquire in the DTSC until December, six months later. And yet, this document had to be a public record. There's no indication that anyone from Shell ever went to the DTSC and said, let me see the permits. If they had, they would have found out that three months before the June 1992 shipment had been sent, the DTSC specifically said, no DO-01 waste. Mr. Gemmenhart didn't send his report in until December 1992. Way too late. No indication that he ever communicated with anybody at Shell prior to the time the June 1992 shipment came in. And most importantly, perhaps, Mr. Pruitt, a Gibson employee on whom Shell relies in other contexts, testified that it was his practice to tell customers who were sending potential DO-01 waste to Gibson that if they wanted Gibson to take it, they should label it DO-08 because Gibson couldn't take DO-01. So there's testimony that they could have been advised specifically. There was simply no substantial evidence that Shell was unable to determine by taking reasonable steps that Gibson could not accept DO-01 waste, was not permitted to take it, or that they were not permitted at the time of the 1990-1992 shipments. And unless there are any questions on that, I think I want to reserve some time so I will not, I'll forego my other argument. Very well. Thank you. Good morning. Michael Leslie for Shell Oil Company. The Court's briefs and their argument here to some extent essentially re-argue evidence that was the subject of significant factual disputes throughout four weeks of trial before Judge Henderson and that were also the subject of the Court's motion for partial new trial. In both cases, the jury, after listening to all the witnesses, including Mr. Gemeinhart and Mr. Pruitt and everybody else from the Court, rejected the Court's claims for negligence per se and also for waste, which the Court does not now appeal. In evaluating the Court's motion for new trial, Judge Henderson also engaged in the limited weighing of the evidence that's appropriate on a new trial motion and held that not only was there evidence in support of the verdict on the negligence per se, the legality or illegality of the shipments at issue, but he characterized the Court's evidence on causation as being insubstantial. And really this case boils down to a fairly simple inquiry that you don't even really need to get into the evidence back and forth on what statute was applicable when and how did the regulations change, how did the Court's permit change in 1990 when they had their Part A application, all that. It doesn't really matter because the entire thrust of that type of argument only goes to one element of a negligence per se claim, namely, is the duty of care element violated. As the Court concedes, as the judge recognized, and as evidence code section 669 itself states, a separate and independent element of negligence per se is that the violations proximately cause the injury at issue. So if there was substantial evidence in support of the verdict on the causational prong, you don't even need to get to looking at the evidence on all the statutory violations or the alleged statutory violations. I would submit, as we indicated extensively in our briefs, both below and before this Court, that there was significant evidence in support of the proper characterization of both the pre-1990 shipments and also of the June 92 shipment. And I'd be happy to go over some of that if the Court is concerned, but on a fundamental level, because the Court failed to prove that any of Shell's shipments, regardless of whether they fell within the permit or not, caused the Court's damages, that's all that this Court has to go to on the substantial evidence test. And the argument there is there's essentially two prongs of causation. The first prong is that the Port conceded below that if Gibson had stayed in business at the end of their lease, they had to remove all of the materials from the tanks and deliver clean tanks to the Port. And even Mr. Giari, the Port executive director, in his testimony testified that he had no reason to believe that if Gibson had stayed in business, that it wouldn't have removed everything out of the tanks. So the first prong that the Port had to show on the causation was that the Shell shipments at issue were the cause of Gibson going out of business and the Port then being stuck with having to clean up the waste. And as we indicated in our briefs, and as the Court found below, the evidence from the people that knew, namely Mr. Van Lovensels and everybody else that was involved, indicated that the reason why Gibson went out of business was because it had significant regulatory issues, not just with its Redwood City site, but with its Wilmington site and with its Bakersfield site that led to the DTSC 144-count civil suit, and that were the subject of some of the criminal charges against them. So there was indeed substantial evidence in the record to support that Shell's shipments, regardless of how characterized, did not cause Gibson to go out of business. And the second prong is the Port had to show, under the negligence per se theory, that some of Shell's materials remained in the tanks at the end of the day. And the evidence there was substantial, that Shell's last shipment was three and a half years before the Port went out of business. It was only, according to the manifest, 1 percent gasoline or some petroleum product and 99, 98 percent water. And on the pre-1990 shipments, we cited Mr. Van Lovensels' testimony below that because those were valuable product containing a lot of crude oil and other materials, that those were cycled out relatively quickly, I think his testimony was, within 30 days of receipt. So now the Port contests and they talk about sludge and they try to parse things out, but the point here is not to reweigh the evidence. The jury heard all that. The Port got to cross-examine all the witnesses. And I think the record is fairly clear that there's substantial evidence supporting the jury's verdict that Shell's shipments, regardless of how characterized, did not cause the Port's damages. And if you find substantial evidence on that prong, then the Port fails on its negligence per se, regardless of how the shipments are characterized. The other point I wanted to raise on the National Contingency Plan issue, because that is a de novo review, is that all of the facts that went into the district court's detailed timeline in its order are undisputed. The Port on appeal and below did not say that on April 27, 1997, the DTSC informed the Port of its closure plan, et cetera, et cetera. All of these facts were borne out not only by Shell's showing and exhibits below, but also by the Port's opposition. So, in fact, it's not correct to say that there were any meaningful factual disputes on the timeline and who did what when, when it comes to the actual actions at the site itself. And really, the only thing that the Port tries to point to, to try to create a factual dispute, is the what they claim to be a finding by the DTSC in the consent order that there was an imminent and substantial threat. And, in fact, if you look at that consent order, that's not what it says. It does not say the DTSC finds after investigation that there's a threat. It says the DTSC alleges that there is an imminent and substantial threat due to the lack of inspection records on the tanks and the lack of secondary containment. And then it goes on in, I think, their findings five and nine to say that the Port disputes all of those allegations. And so that was merely an allegation and a recital in the consent order. It certainly can't be elevated, as the Port seeks to do here, to the be-all and end-all of this issue. And even if it was a finding by the DTSC that was somehow entitled to some weight, it would only be one factor in a very long chain of events. And what Judge Henderson found below in rejecting the Port's circular claim on the NCP compliance issue was that the Port couldn't parse out in a self-serving way just certain sections of its activities in order to try to squeeze into one of the exceptions. The Port, in the face of Shell showing below, had the burden under Anderson v. Liberty Lobby and all of its progeny to come forward with admissible evidence to establish genuine issues of triable fact on not just how was the action to be characterized, but also as to what did it do to comply with the National Contingency Plan. And as Judge Henderson found below, based upon the undisputed timeline and factual was a time-critical removal action, which is defined in the regulations to be something that has to take place within six months. And clearly, if you look at the judge's timeline, the Port hired its consultant, McLaren Hart, in February of 1996, and submitted its first draft closure plan to the DTSC on May 3, 1996. And then the consent, after some revisions, the consent order came in almost two years later, over two years later, on May 6, 1998. And then the activities of both removing the oily waste and treating the water and then removing the sludge and then removing the residual paraffin coating on the tanks and decommissioning, they were ongoing as of the 2001 motion for summary judgment. And frankly, they were ongoing as of the trial in this case. So the overall activities engaged by the Port, which I think you do have to look at them, were clearly consistent with a permanent remedial action. Now, the Port said in its argument this morning that the Port didn't know there was an imminent threat until the consent order came out. Well, that's because we submit that the evidence shows that there was never an imminent threat. The tanks never ruptured. Nothing was ever released from the tanks. There was no explosion. And the Port understood this because they had been leasing to petroleum businesses on that site since the mid-1960s. And since 1986 or so, we're leasing to companies that treated oil and water mixtures and various kinds of petroleum products to sell. So this was nothing new or different that was going on on the site that hadn't gone on for many, many years. Also, the DTSC itself had been investigating Gibson's operation at the site for years, at least going back to 1992 when the search warrant was implemented at the site. And even before that, they were always out there going through Gibson's records. And the Port knew this. The Port was fully in the loop on all of that. So when you look at the NCP compliance issue, it is based on undisputed facts. And the only thing that the Port really is complaining about on appeal is they disagree with the way that Judge Henderson applied those undisputed facts to the factors that he was required to look at under the law and under the regulation. And that is the province, the proper province of the NCP prong, is the only place that Judge Henderson is entitled to weigh those undisputed as to who did what when. He is then entitled to weigh those and balance those using the legal factors that are set out in the case law and in the regulations. And he did so, and the Port has not demonstrated error. In terms of the compliance with the NCP prong, the Port below made no comment on that. The only thing that the Port did was show in opposition to Schell's motion that they had complied with the National Contingency Plan for anything other than a time-critical removal, since the burden shifted to them in the face of Schell's showing to come forward with a triable issue of fact if there was one. If they had complied with the NCP requirements for a remedial action, it was their burden to prove that, to show a triable issue on that, and they failed to do so. And that's what Judge Henderson held below. He didn't duck the issue. He just said that he didn't need to reach it because it was clear that the Port hadn't made that showing, and so, therefore, there was essentially a concession by the Port that they could not meet. And, in fact, the record shows that they could not meet that in any event because they didn't do a remedial investigation, a feasibility study. They didn't get public comment on the various plans. They didn't respond to those public comments. They didn't go through the record of decision process and all the other detailed requirements that are set forth in the National Contingency Plan for both remedial actions and also for non-time-critical removal actions. So the Port failed to sustain its burden below, and it's failed on appeal to demonstrate why the Port failed to sustain its burden below. I think one issue that was raised by Judge Graber on the statute of limitations, our position is that because there's clearly substantial evidence in support of the verdict, you don't need to reach that point. But even if the Court were to have some question in that regard and did consider a remand, then it would be right to go and look at Shell's Rule 50A motion. My question didn't make it clear that it seemed to me that that could be an alternative basis to affirm, not to remand or revert. Yes, it would be. The jury found in your client's favor, but if the case should not have gone to the jury at all, then your client would prevail for a remand. I wasn't suggesting that a remand would be appropriate. You're right, it would be an alternative basis to affirm or at least to remand to the trial court to rule on that motion, because it became moot, of course, when the jury rejected the Port's claims. But we felt that below, that the chain of events in which the Port admitted knowing about the problems with Gibson, and ultimately the Port's own attorney, the Port attorney, admitted that he knew that they would be responsible for cleaning it up, and he knew he had potential claims against the generators. The only real response to that is that the Port claims that it didn't discover the manifest regarding the June 92 shipment until 2001, and that somehow that's a significant fact. But the reality is the Port did sue Shell. Sued Shell on December 18, 1998, I believe it was. And they sued on CERCLA, they sued on negligence, they sued on a whole variety of different causes of action. So it's not as though they didn't know that Shell wasn't involved. The only thing that the Port did when it discovered that invoice was it amended to add in a claim for punitive damages, which was also rejected for the jury. So I don't want to make too much of that because I don't think the Court really even needs to get to that. In terms of the jury instruction issue, again, it really boils down, once again, to harmless error and causation, because even if the Court were incorrect in providing that jury instruction, the fact of the matter is that there's substantial evidence that the Port did not prove causation, either on the factor of Gibson going out of business or on any of Shell's materials still being in the tanks when Gibson did go out of business. And so any back and forth on the jury instruction only goes to the element of was the duty of care violated. It doesn't even address the causational element. More fundamentally, though, the Port doesn't say that that's an incorrect statement of the law. Again, they're just arguing the evidence. They didn't believe Mr. Gemeinhart's steps were reasonably diligent enough. They didn't believe some of his testimony. But, of course, they had a full chance to cross-examine him at trial, and that came in to the jury. The jury evaluated it, and more importantly, Judge Henderson evaluated it on the motion for partial new trial and rejected it. He said there was enough evidence, given the legal standards, to provide that instruction. He said there was enough evidence, given the legal standards, to provide that instruction to the jury and that it was not misleading. And one point that he made that is also substantial on that is that, in fact, Shell would have been entitled to a more lenient instruction. Under Evidence Code Section 669B, which is the negligence per se theory, it specifically says that the presumption that is created by the person violating the statute, ordinance, or regulation did what might reasonably be expected of a person of ordinary prudence acting under similar circumstances who desired to comply with the law. That's a much more lenient standard than Judge Henderson's instruction, and we believe we complied with that standard as well. But the point is it's harmless error anyway, because it only goes to that single prong on the negligence per se, not to the causational issue. And, of course, the fact that the jury also rejected the Court's claim for waste, which didn't even have these statutory violation issues, I think is something that the Court can consider in determining whether that was harmless error with respect to that instruction. I won't address in detail, because I think it's fairly clear, that the Court's appeal of the denial of this motion for summary judgment is simply not appealable. Under the Lucretio case and the Lum and General Signal Corporation cases, they simply can't appeal that. Similarly, they purport to appeal the Court's denial of its motion for partial new trial, but that standard is even more stringent than the substantial evidence standard. The standard there under the Hemings case is that it's appropriate to reverse only if the record contains no evidence in support of the verdict. And clearly it does on both the nature of the shipments and also the causation. So, really, the fundamental point boils down to is there substantial evidence to show causation, and the answer is the Court failed to show causation, and there's substantial evidence in support of the jury's verdict in that respect. And there's also substantial evidence to support that there were no statutory violations by the shell shipments. Thank you, counsel. Let me quickly respond to the causation and the statutory violations. I think in our reply brief we set out rather clearly the causation issue. We pointed in our appellant brief to the amount of material that was sent by shell to the port. It was the largest single contributor of material to the port. And given the amount of sludge that was carried out and the amount of sludge that remained on the port at the time that Gibson left, almost any calculation you go through indicates that part of the material that the port was going to have to carry or have to remove was sludge left by the materials that shell sent to the port. The other part of causation was shells, were any actions of shells germane to Gibson leaving. Well, according to Mr. Van Globen's cells, he believed that the June 1992 shipment and the DTSC's investigation of that case formed part of the complaint, the civil complaint against Gibson. And certainly it was part of the criminal complaint by the San Mateo. And Mr. Geminhart testified that when an agency begins investigating and puts more pressure on a facility, that shell, that's a factor going into a negative recommendation, because there's always a chance that the facility will go under and the pressure. So there was certainly effort of causation on both of the factors, which Mr. Leslie mentioned. As far as no statutory violation, if you look at the hazardous waste manifest, and there are two of them, one's at 1ER28 and the other one is at 6ER1401, you will see a statutory violation. On the face of that document, it demonstrates that shell, contrary to law, did not certify that the contents of that manifest are correct. And that is important. It's important because the shipper of hazardous waste, the generator, has a legal obligation to determine, if it doesn't know already, the exact material that it is shipping, the hazardous waste that it's shipping. It's the only way the DTSC and the Federal Government can track the material. It's the only way the facility, where it's going to end up, can determine what it needs to do to treat it. And in this case, what you had was a hazardous waste manifest in which the generator doesn't certify that its description of the material as a D018 is accurate. That was compounded, of course, when it became obvious that on the Gibson liquid profile sheet, shell certified, that the contents of the same barge were D001 waste. They had tested the material. They certified it was D001. They were legally obligated to correctly identify the material on the hazardous waste manifest. There is no indication that they ever tested it again before they submitted it for shipping or for delivery, and that is their legal obligation. So as to whether or not Shell violated the law, you see it right on the hazardous waste manifest. That's why, of course, the trial court should have one of the reasons, the rest are in our brief, that the trial court should have found in the Port's motion for summary adjudication that we'd satisfied the first prong of negligence per se, and should have granted our request that not only should the court find that, but that it should instruct the jury that Shell had violated that law as a matter of law, because it had nothing to do with disputed facts. It's evident just by looking at the hazardous waste manifest. So I think that there was a showing of causation. Damages never went to the jury because they determined that there was no negligence and that the causation that we showed was adequate to have gotten us past negligence per se, absent, absent the erroneous jury instruction. Thank you, counsel. Thank you both for your arguments and your presentations. They've been very helpful to the court.
judges: Thomas, Graber, Paez